## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 10-cv-00310-REB-CBS

RANDALL GUY, and
JUSTIN GUY,

      Plaintiffs,

v.

MENDAKOTA INSURANCE COMPANY, a corporation,

      Defendant.

_____

## PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT (DOC. NO. 34)
_____

Plaintiffs, Randall and Justin Guy, by and through their attorneys, ROBERTS LEVIN ROSENBERG PC, submit the following Response to Defendant's Motion for Summary Judgment (Doc. No. 34) (hereinafter "Defendant's Motion"):

## I.     INTRODUCTION

The facts of this insurance bad faith action[1] are largely undisputed, and for the most part are accurately, albeit somewhat incompletely, set forth in Defendant's Motion.[2] Defendant seeks summary judgment with respect to Plaintiffs' claims for bad faith breach of insurance contract and for punitive damages, arguing in the face of two different expert

---

[1]     This is a diversity action presently before the Court by way of removal. As conceded by Defendant, Colorado substantive law is controlling. Plaintiffs filed a Motion to Remand (**Doc. #8**) on March 15, 2010 which remains pending and are submitting this Response without waiver of their position.

[2]     Defendant has admitted to numerous additional relevant facts, including those set forth in paragraphs 5-14, 16-26, 28-30, and 32-42 of Plaintiffs' Amended Complaint and Jury Demand (Doc. No. 32), attached hereto as **Ex. 1**. These additional undisputed facts are highlighted on **Ex. 1** for the Court's convenience, and provide further support for Plaintiffs' position in this matter that summary judgment is inappropriate. Defendant's Answer to Amended Complaint (Doc. No. 35) is attached hereto as **Ex. 2**.

witnesses that its handling of the Savages' personal injury claim against Plaintiffs was reasonable as a matter of law.   Secondarily, it argues that Plaintiffs' bad faith claim is barred by the doctrine of *res judicata* because it constituted a compulsory counterclaim which should have been asserted in responding to Mendakota's complaint in interpleader.

Mendakota's arguments should be rejected.   An abundance of evidence exists from which a jury could readily conclude that Mendakota acted unreasonably in failing to seize the opportunity that existed over several months to settle the Savages' claims against Plaintiffs within their insurance policy limits, and that such unreasonable conduct caused Plaintiffs to suffer economic harm in the form of substantial excess judgments.   Meanwhile, Mendakota has acknowledged in deposition that its conduct was purposeful, deliberate, and taken with full knowledge that failing to settle would likely result in the entry of judgments against the Guys substantially in excess of the $25,000 limit.   That this eventuality came to pass, when it could have readily been avoided in numerous ways, establishes the insurer's liability both for bad faith and punitive damages.   Defendant's remaining argument–claim preclusion–is groundless.   Plaintiffs' bad faith claim did not constitute a compulsory counterclaim for purposes of Colo.R.Civ.P. 13 because it had not accrued / matured at the time Plaintiffs filed their answer to the interpleader complaint.

## II.      ARGUMENT

### A.      Summary Judgment on Plaintiffs' Punitive Damages Claim is Improper.

In likely recognition of the weakness of its two other arguments, Mendakota begins its Motion by taking aim at Plaintiffs' punitive damage claim, contending, as it did in unsuccessfully resisting Plaintiffs' Motion to Amend Complaint filed several months ago,

that Plaintiffs lack sufficient evidence of willful and wanton conduct to warrant submission of the issue of punitive damages to the jury. *See* **Doc. No. 26** (Motion to Amend Complaint); **Doc. No. 29** (Response); **Doc. No. 30** (Reply); **Doc. No. 31** (Order).

For the reasons set forth in Plaintiffs' Motion and Reply, attached hereto as **Ex. 3** and **Ex. 4**, a reasonable juror could readily conclude that Defendant's conduct was purposefully committed under circumstances demonstrating a willful and wanton disregard for the rights and interests of Plaintiffs. Accordingly, the question of punitive damages should be submitted to a jury for determination. While it is not possible in the allotted page limit to describe the entirety of the evidence which Plaintiffs plan to introduce at trial on the issue of punitive damages, rendering the request for summary judgment on the punitive damage claim arguably premature, the reality is that the facts and law establishing Defendant's liability for bad faith likewise establish its liability for punitive damages. For the sake of convenience, and to avoid repetition, the facts and law supporting both the bad faith and punitive claims are discussed in the succeeding section on bad faith.

**B.    Summary Judgment on Plaintiffs' Bad Faith Claim Is Inappropriate.**

1.    *Mendakota Acted Purposefully and in Bad Faith.*

This is a third-party bad faith case, which "arises when an insurance company acts unreasonably in investigating, defending, or **_settling_** a claim brought by a third person against its insured under a liability policy." *Goodson v. American Standard Ins. Co. of Wisconsin*, 89 P.3d 409, 414 (Colo. 2004) (emphasis added). On account of the quasi-fiduciary nature of the insurance relationship in a third-party context, "the standard of conduct required of the insurer is characterized by general principles of

negligence," *id.*, not knowing or reckless unreasonableness as required in first-party insurance bad faith cases.  Thus, to establish that the insurer breached its duty of good faith and fair dealing in the third-party context, the insured need merely show that "a reasonable insurer under the circumstances would have paid or otherwise settled the third-party claim." *Goodson*, 89 P.3d at 414; *see also Novell v. American Guar. & Liab. Ins. Co.*, 15 P.3d 775 (Colo. App. 1999) (issue of insurer's bad faith is one of fact).

Where a "reasonable possibility" exists that a judgment will enter against an insured in excess of his policy limits, and the insurer has the opportunity to settle the claim within those limits but fails to do so, the insurer may be held responsible for bad faith.  *Potomac Ins. Co. v. Wilkins Co.*, 376 F.2d 425, 429 (10th Cir. 1967) ("It is apparent that Potomac . . . [in rejecting policy limits settlement offer] did not afford equal consideration to the interests of [its insured as it afforded its own]"); *see also.Aetna Cas. & Sur. Co. v. Kornbluth*, 471 P.2d 609 (Colo. App. 1970) (applying the equal consideration rule) (cited as binding authority in Defendant's Motion).

In the instant case, the undisputed facts and law clearly demonstrate that the issue of bad faith, like the issue of punitive damages, should be submitted to a jury for determination.  Mendakota was actually aware of, is deemed to be aware of, or has admitted, the following, which more than adequately require denial of the Motion:

- The Guys faced liability greatly in excess of their $25,000 policy limits as a result of their respective roles (with Randall Guys' being merely vicarious) in causing the January 8, 2008 accident and Mr. Savage's injuries **Ex. 5**, April 11, 2008 Letter;

- Mr. Savage's medical bills exceeded $1.2 million.  **Ex**. 1, at ¶ 18; **Ex**. 6, July 25, 2008 Letter Chalat to Mendota.

- The Savages offered and were willing to release the Guys in exchange for payment of $25,000 from Mendakota, which if accepted by Mendakota would have eliminated the Guys' excess exposure **Ex.** 6.;

- The Savages made clear to Mendakota that they were not willing under any circumstances to release the driver, Mr. Ruszkowski, of liability for his primary role in causing the accident and Mr. Savage's injuries, in exchange for all or any portion of the $25,000 policy limits.  **Ex**. 1, at ¶ 20; **Ex**. 6, July 25, 2008 Letter;

- Mendakota refused and indeed never attempted to settle the Savages' claims against the Guys only, which would have eliminated their excess exposure.  **Ex**. 7, July 16, 2008 Letter; **Ex**. 8, Deposition of Susan Cavanagh, at 56 ll. 1-13;

- Mendakota's corporate explanation for why it did not settle the claims against the Guys only, when it had the opportunity to do so, is that it has a rule that it will not pay policy limits unless it can obtain a release of all potentially responsible insureds through such payment.  **Ex**. 9, Deposition of Julie Colburn, at 100-102; **Ex**. 8, Cavanagh, at 107-108 (hereinafter "the all-or-nothing rule");

- The "all-or-nothing-rule" is not contained in the Mendakota policy or in the insurer's claims manual.  **Ex.** 10, Deposition of Virginia Olsby, at 103-104.

- The "all-or-nothing-rule" finds no support in the case law or in secondary authorities, which all note the well-accepted rule that a liability insurer handling claims against multiple insureds can settle on behalf of some insureds to the exclusion of others even

where doing so could exhaust the insurance policy limits.  In fact, Defendant has conceded that it was not precluded from settling in this fashion by the terms of the insurance policy.  **Mtn**., at 14; *see also* RUSS & SEGALLA, 14 Couch on Insurance 3rd § 203:29 at 203-48 (2008) ("Where multiple claims arise out of one accident a liability insurer may exercise its discretion in how it elects to settle claims, and may even choose to settle certain claims to the exclusion of other claims due to the exhaustion of policy limits, provided that the decision is reasonable and in keeping with its good faith duties to its insured."); *Contreras v. U.S. Sec. Ins. Co.*, 927 So.2d 16 (Fla. App. 4 Dist. 2006) (permitting bad faith claim to go forward under virtually identical facts to the case at bar); *Elliot Co. v. Liberty Mut. Ins. Co.*, 434 F.Supp.2d 483, 499 (N.D. Ohio 2006) ("It is clear that an insurer can settle or pay claims in good faith to one insured, even if this results in actual exhaustion of the policy limits to the detriment of another insured.") *Princeton Ins. Co. v. Qureshi*, 882 A.2d 993, 998 (N.J. App. 2005) (holding that insurer acted in bad faith by refusing policy limit offer to settle a claim against a physician's corporation unless plaintiff also agreed to settle against the physician); *Anglo-American Ins. Co. v. Molin*, 670 A.2d 194, 198-99 (Pa. 1995); *Vitek, Inc. v. Floyd*, 51 F.3d 530 (5th Cir. 1995) (describing as "an article of faith" unsupported by authority the notion that "[a]n insurance company cannot prefer one of its insureds over another"); *Shin Crest PTE, Ltd. v. AJU Ins. Co.*, 368 Fed. Appx. 14, 16 (11th Cir. 2010) ("(A)n insurer's duty of good faith to an insured is fulfilled when it attempts, unsuccessfully, to obtain a release for the insured while settling claims against a co-insured. Conversely, an insurer that fails to

settle on behalf of a co-insured because it cannot obtain a settlement for both insureds may be held liable for bad faith as to the co-insured");

- *A fortiori*, had Mendakota settled on behalf of the Guys and not applied the "all-or-nothing-rule," the excess judgments would not have entered against them;

- The Savages' offer to release the Guys remained open, and could have been accepted by Mendakota, until it was withdrawn on January 2, 2009; **Ex**. 11, January 2, 2009 Letter; **Mtn**., at 3;

- When Mendakota first rejected the Savages' offer to settle with the Guys by letter dated July 16, 2008, it did so without consulting the Guys or Ruszkowski. **Ex. 2**, ¶ 16;

- Had Mendakota contacted Ruszkowski, he would have advised Mendakota to settle the claims on behalf of the Guys even if it left him with no insurance **Ex.** 12, Deposition of Kevin Ruszkowski, at 26 ll. 1-20;

- Even had Mr. Ruszkowski not agreed to Mendakota settling on behalf of the Guys only, acceptance of the Savages' offer would have made no practical difference to Ruszkowski because under the terms of the Savages' offer he was to receive a credit for the full amount of the indemnity limit - $25,000; **Ex**. 6;

- The decision of whether or not to defend Ruszkowski after paying the $25,000 policy limit to secure releases for the Guys would have been entirely within Mendakota's discretion; **Ex**. 8, Cavanagh, at 118 ll. 15-18;

- Mendakota paid its policy limits on March 6, 2009 and is nevertheless continuing to defend Ruszkowski, demonstrating that the insurer will, when it deems appropriate,

defend an insured despite having paid its limits and despite any conflicting language contained in the insurance policy; **Ex**. 8, Cavanagh, at 101 ll. 6-25;

- If Mendakota was truly concerned that it would not be able to defend Ruszkowski after paying its policy limit to secure releases for the Guys, a disingenuous proposition given that it is presently defending him having paid the policy limit, it could have approached the Guys and asked them to make some small contribution to the settlement, such as $1.00, so that it could say the limits were not completely eroded with regards to the issue of the continued defense of Ruszkowski; **Ex**. 13, Windt Deposition, at 62 ll. 3-22;

- Mendakota did not approach the Guys to ask whether they would be willing to contribute any money to a settlement at any point in time between the date of the accident and the present;

- Mendakota at no point in time offered to pay the $25,000 policy limit, or any portion of that limit, to secure a release for the Guys;

- Rather than attempt to effectuate a settlement on behalf of the Guys when it knew that the Savages were unwilling to settle with Ruszkowski, Mendakota filed its interpleader complaint, seeking relief to which it knew it was not entitled–a release for itself and all three insureds in exchange for its payment of the $25,000 policy limit into the court registry; **Ex**. 14 (Interpleader Complaint);[3]

- Two leading insurance industry experts, including a Professor of Insurance, Garth Allen, Esq., and a nationally-renowned insurance commentator and author of a leading insurance treatise cited as authoritative by more than 300 courts across the

---

[3]      Mendakota deposited the $25,000 into the court registry on March 6, 2009.  **Ex.** 15.

country, Alan Windt, Esq., have independently concluded that Mendakota's handling of the Savages' personal injury claim was manifestly unreasonable and contrary to well-accepted claim handling principles applicable in the insurance industry.  **Ex.** 13 (Deposition of Alan Windt) and **Ex. 16** (Deposition of Garth Allen).

2.      *Mendakota's Arguments in Favor of Dismissal Lack Merit.*

Defendant first contends, without citation to authority, that it cannot be held responsible for bad faith or punitive damages because this is a case of first impression in Colorado and the law in other jurisdictions is unsettled concerning the question of whether a liability insurer can be found liable for bad faith breach of insurance in these exact circumstances.  That no Colorado case has addressed an insurer's bad faith liability in these particular circumstances – likely because no other carriers apply the "all-or-nothing-rule", misses the point.  Colorado law, as Mendakota concedes, requires liability insurers to act reasonably under the circumstances.  **Mtn**., pp. 7-8 (citing *Aetna Cas. & Surety Co. v. Kornbluth*, 471 P.2d 609 (Colo. App. 1970)).  Here, an abundance of evidence exists, including testimony from a nationally-renowned insurance claim handling experts, from which a jury could readily conclude that Mendakota acted unreasonably in handling the Savages' personal injury claims against the Plaintiffs, and that such unreasonable conduct caused damages to the Plaintiffs.  Colorado's courts have never suggested, let alone held, that a liability insurer's otherwise unreasonable conduct may be rendered reasonable by the fact it has not contravened an appellate court decision compelling it to take a certain position in response to a particular set of facts.  The argument is circular and simply begs the question.  Liability insurers such as Mendakota have an obligation to act reasonably

and if they fail to do so they may be held responsible for the consequences of their unreasonable conduct. This is a classic issue of fact.

Mendakota next claims, again without citation to a single authority, that it should not be held responsible for bad faith or punitive damages because it discharged its contractual duties by defending all three insureds and by making its policy limits available through the judicial process of interpleader. **Mtn**., at 8. Plaintiffs are not suing for breach of an express contractual duty; they are suing for breach of the implied covenant of good faith and fair dealing. Indeed, Defendant says nothing more than could be said with respect to any contested excess judgment case, as the vast majority involve a carrier which defends the insured, pays its limit of indemnity after entry of the excess judgment, and denies liability for the remainder of the judgment exceeding the policy limits. This unsupported argument thus deserves rejection.

Mendakota further contends without citation to authority that it should not be held responsible for bad faith or punitive damages because the trial court found Justin Guy's conduct to be reprehensible. **Mtn**., at 8-9. Whatever might be said of Justin Guy's conduct, it has absolutely nothing to do with the question now before the Court: *do issues of fact exist with regard to whether Mendakota acted unreasonably, and willfully and wantonly, in connection with its overall handling of the Savages' claim, including but not limited to its decisions respecting settlement*? Nor does the alleged reprehensibility of Justin Guy's conduct provide an explanation for why Randall Guy should not be entitled to recover for the harm caused him by his insurer's wrongdoing. In any event, this would appear to be little more than a not-so-subtle effort on the part of the Defendant to smear

Justin Guy and his father, which is entirely consistent with the manner in which Mendakota has treated them since the date of the accident.  Mendakota did not and could not reserve rights based on some notion of reprehensibility, and its quotation to the trial court's remarks concerning the behavior of Justin Guy – 18 years old at the time – is not helpful.

Mendakota next avers that it should not be held responsible for bad faith or punitive damages because the Savages' settlement offer placed it in a Catch-22 situation whereby it could not simultaneously fulfill its duties of good faith and fair dealing to both Plaintiffs and Mr. Ruszkowski.  In light of the facts and law discussed in the preceding section on bad faith, Mendakota's "Catch-22" argument rings hollow.  Mendakota had ample opportunities available to it, as it testified in deposition, to purchase immunity for the Guys and at the same time fulfill its obligation to deal fairly and in good faith with Mr. Ruszkowski.  **Ex.** 8, at 121-28**.**  Had Mendakota given the matter thought, as a reasonable insurer would have, it would have realized that settling the claims against two of the three insureds was in everyone's best interests, including its own.  To be sure, the Guys would not have multi-million judgments against them, Mendakota would have paid substantially less in defense fees than it ultimately did defending all three insureds, and Ruszkowski would be in no worse position than he presently finds himself.  Admittedly acting out of concern for its own interest in not subjecting itself to a potential bad faith claim from Ruszkowski,[4] however, Mendakota consciously chose not to settle the Savages' claims against Randall and Justin Guy with full knowledge that the inevitable result of its

---

[4]     In deposition, Mendakota testified that its decision to reject the Savages' offer was not made out of concern for any bad faith exposure it might face with respect to Ruszkowski. **Ex.** 8, at 124.  Mendakota has now imporoperly changed its position on this issue, claiming that it was in fact concerned about a bad faith claim from Ruszkowski, though it did not even bother to contact prior to rejecting the offer.

decision would be the entry of substantial excess judgments against each of them and a lifetime of collection proceedings. **Ex.** 8**,** at 55-56.

While Mendakota's implies that it was looking after Ruszkowski's interests in refusing the Savages' settlement offer, the truth is it never even bothered to contact him prior to rejecting the offer, as noted earlier. Mendakota's failure to contact Ruszkowski in connection with the offer belies any claim it was motivated out of concern for him. Certainly, his interests, as noted above, would have been more than adequately protected had Mendakota settled with the Guys because it would have simultaneously provided him with a policy limit credit. Moreover, "the decision of whether or not to defend Mr. Ruszkowski was entirely in [Mendakota's] discretion," and it could have defended him regardless of any policy language respecting the exhaustion of policy limits. **Ex.** 8, at 118. As noted by Mr. Windt, "if Mendakota was concerned about whether it would have had the right to withdraw its defense of Mr. Ruszkowski after it paid its policy limit to obtain releases for the Guys, the solution would obviously have been to continue paying for Mr. Ruszkowski's defense (as Mendakota had to do anyway absent the settlement) -- not to refuse to obtain releases for the Guys. **Ex.** 17, Report of Alan Windt Report, at 5;[5] **Ex.** 13 (Deposition of Allan Windt) (noting that Mendakota

---

[5]     Mr. Windt explains further in his report: "Making Mendakota's conduct even more unreasonable is that, even under Mendakota's manifestly erroneous belief that it could not use its entire $25,000 policy limit to protect the Guys, it had to have believed that it could at least use a significant portion of the $25,000 to protect the Guys. Obviously, therefore, Mendakota should have done two things. First, it should have advised the Guys how much of the $25,000 settlement offer it was willing to contribute and give the Guys the opportunity to try to make up the difference with their own money. Second, if that did not lead to a settlement on behalf of both of the Guys, Mendakota should have tried to settle for at least one of the Guys. For example, Mendakota could have, after getting the approval of Justin to at least try to save his father, offered to settle solely for Randall in return for the portion of the $25,000 policy limit that it had been willing to contribute on behalf of both of the Guys (plus whatever amount the Guys were able to

could have also held back $1.00 from the settlement and asked for contribution from the Guys in that amount, which they obviously could and would have readily provided).

Defendant next argues, again without citation, that it should not be held responsible for bad faith or punitive damages because Plaintiffs did not timely heed its recommendation that they hire personal counsel to advise them concerning their exposure to a judgment in excess of the policy limits. **Mtn.**, at 12.  The disingenuous implication of this argument is that the earlier hiring of personal counsel would have changed the outcome, which is belied by the insurer's corporate testimony. **Ex.** 8, at 55-56 (testifying that Mendakota would handle the claim the same way (i.e. refuse to settle) if it were presented again tomorrow).  Having caused catastrophic judgments to enter against two of its three insureds, which admittedly could have been avoided through payment of policy limits, Mendakota is uniquely ill-situated to blame the Guys for failing to hire counsel.  Indeed, in the August 5, 2008 letter, Mendakota stated that it was hiring Mr. Tienken to represent their interests both in the interpleader and in any personal action. As Mr. Windt has explained, there is no reason, much less a requirement, that an insured who is being defended hire personal counsel, as the insured is entitled to rely on the insurer to provide a defense and to act in good faith. **Ex.** 13, at 37 ll. 11-21.

Defendant also seeks to avoid bad faith and punitive liability by arguing that the instant bad faith claim was "manufactured" by the Savages' counsel, citing a single case that it admits "involved different circumstances."  **Mtn.**, at 13-14 (citing *Wade v.*

contribute). Instead of doing that, however, Mendakota - concerned solely with its own interests -- simply paid its $25,000 policy limit into court." **Ex.** 17, at 6.

13

*EMCASCO Ins. Co.*, 483 F.3d 657 (10th Cir. 2007).   Notably, it fails to cite a Colorado

case, directly on point, which holds that an attorney's "*motivation* or *intent*" to "set up" a

bad faith is legally and logically irrelevant.   *Miller v. Byrne*, 916 P.2d 566, 576 (Colo.

App. 1995).   In any event, it is hard to understand how the Savages could have been

"setting up" a bad faith claim in these circumstances, where they practically begged

Mendakota to settle with the Guys (see **Ex.** 6), where they left the offer open, despite its

earlier rejection, for more than 5 months after the interpleader was filed, and where it

would not have acted in bad faith towards Ruszkowski by accepting the offer because

no opportunity existed to settle the claims against him within policy limits, because he

would have been given a credit for the $25,000 policy limit payment, and because the

insurer could have readily continued to defend him despite settling the claims against

the Guys.  **Ex.** 13; **Ex.** 17.   Indeed, it ended up defending him anyway, along with the

Guys, and it has in fact continued to defend him despite paying the policy limits.

Moreover, as a matter of causation, Mendakota has not and cannot establish that

it was "set up" because it never offered to pay its policy limits in exchange for a release

of the Guys only.   In the *Wade* case, a limits offer was later made which was rejected by

the claimant and the insurer claimed to have been "set up," *i.e.*, it asserted the claimant

never really wanted to settle the case for policy limits, pointing to the claimant's later

rejection of a limits offer in support of its position.   Obviously, this did not happen here

and the insurer is merely speculating about the Savages' counsel's supposed

motivations.   *See Roberts v. Printup*, 595 F.3d 1181 (10th Cir. 2010) (distinguishing

*Wade* and holding that insurer's attempt to accept passenger's expired offer to settle did not absolve it of liability for bad faith failure to settle and resulting excess judgment).

Defendant lastly claims that Plaintiffs' bad faith claim is a compulsory counterclaim which should have been asserted in the Answer which Plaintiffs' Mendakota-appointed attorney, Jim Tienken, filed on their behalf in response to Mendakota's Complaint in Interpleader. Mendakota's assertion of this defense is but further evidence of its bad faith leading up to and continuing throughout this action. Mendakota knew that it was not proper to file the interpleader action in the first place--because there were no multiple conflicting claims to the policy limit and it knew that the relief it requested could not be granted. Mendakota knew that the Guys could have no claim to the policy limit and were not proper defendants in an interpleader action. Mendakota further knew, and expected, that naming the insureds as defendants in the interpleader action would precipitate cross claims from the Savages in which liability was clear and the exposure in damages huge. Mendakota's argument that the Guys' later-filed bad faith claim was a fully vested compulsory counterclaim at the time their answer was filed plainly implies that the attorney it retained to defend the Guys should have sued it for bad faith but did not and thereby immunized Mendakota from the consequences of its bad faith conduct. A more audacious request of a wrongdoer to profit from its own wrongdoing is hard to imagine. However, the facts and the law should not allow that to happen here.[6]

---

[6]     Mendakota's current position respecting the alleged compulsory nature of Plaintiffs' bad faith claim is also diametrically opposed to the position it took less than two months ago in responding to Plaintiffs' written discovery, wherein Mendakota answered "No" to the following question: "Is it YOUR position that Jim Tienken, as counsel appointed by YOU to represent the PLAINTIFFS in the UNDERLYING LAWSUIT, had grounds to assert a counterclaim against YOU for bad faith breach of insurance contract at the time he filed PLAINTIFFS' Answer in the UNDERLYING LAWSUIT?" **Ex. 19**.

> A compulsory counterclaim is:
>
> . . . any claim which at the time of filing the pleading the pleader has against any opposing party, if it arises out of <u>the transaction or occurrence</u> *that is the subject matter of the opposing party's claim* and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

Colo.R.Civ.P. 13(a) (emphasis added); *see also In re Matter of Krotiuk*, 12 P.3d 302, 304 (Colo. App. 2000).   Whether a claim arises out of the same transaction or occurrence is determined by the logical relationship test.  Claims are "logically related" if separate trials on those claims would involve a substantial duplication of time and effort. *Beathune v. Cain*, 494 P.2d 603 (Colo. App. 1971); *FDIC v. Hulsey*, 22 F.3d 1472, 1487 (10th Cir. 1994) (other factors to consider include whether "the issues of fact and law raised by the principal claim and the counterclaim are largely the same" and whether "the same evidence supports or refutes the principal claim and the counterclaim . . . .").

There are exceptions to the rule, one of which is the "maturity exception."  A "counterclaim must be completely vested at the time defendant serves his answer for such claim to be 'mature' for the purposes of Rule 13(a)."   *Steinbert v. St. Paul Mercury Ins. Co.,* 108 F.R.D. 355, 358 (S.D.Ga. 1985).  This exception derives from the express language of Rule 13(a) that limits its application to claims the defendant has "at the time of filing the pleading."   *See Allen*, 203 P.3d at 557.   Thus even a counterclaim that arises from the same "transaction or occurrence" is not compulsory if the claim has not matured at the time of the pleading.   *See Krotiuk*, 12 P.3d at 305.   Counterclaims that arise after an answer has been filed are not compulsory, even if they arose out of the same transaction.   *See Stone v. Dept. of Aviation*, 453 F.3d 1271, 1276 (10th Cir.

2006) (citations omitted). A counterclaim that is contingent, even if likely or expected, to arise after an answer is filed has not matured for the purposes of Rule 13(a). *Steinberg v. St. Paul Mercury Ins.*, 108 F.R.D. 355, 358 (S.D.Ga. 1985).

A claim in interpleader is a limited procedural device to permit a disinterested stakeholder to protect itself from multiple claims to money it holds and knows should be paid (the "stake") to one or more claimants. *See 4 James Moore, Moore's Federal Practice* § 22.02(1) (3d ed. 2005). Its purpose is narrow--to avoid the risk of double liability for the same sum of money by allowing the stakeholder to deposit the money with the court and permit those who claim a right to some or all of that money to litigate their claims. *See Island Title Corp. v. Bundy*, 488 F.Supp.2d 1084 (D. Hawaii 2007); *see also* 7 *Fed. Prac. & Proc.* Civ. Section 1702 (3d ed.).

Mendakota initiated the interpleader action on August 14, 2008, pursuant to Colo.R.Civ.P. 22, naming as defendants not only Paul and Pam Savage who had claims against Mendakota's policy limit, but also its three insureds, Randall Guy, Justin Guy, and Kevin Ruszkowski, none of whom had any colorable claim to the policy limit. Mendakota sought relief in the form of discharge of any further liability as to all five persons it named as defendants, relief to which it knew it was not entitled.

In interpleader actions, the only "subject matter of the action is not a set of facts, a transaction or other occurrence which gives rise to litigation, but a specific identified fund or property." *See N. Natural Gas Co. v. Grounds*, 292 F.Supp. 619, 640 (D. Kan. 1968), *aff'd in part, rev'd in part*, 441 F.2d 704 (10th Cir. 1971). The sole *subject matter* of the interpleader claim was the $25,000 limit. Further, claims against an interpleader

plaintiff must not only relate to the fund, they must be asserted against the fund. *Id.*; *see also Libby, McNeill & Libby v. City Nat. Bank*, 592 F.2d 504, 507-08 (9th Cir. 1978) (counterclaimant must make a claim against the interpleaded fund).

Mendakota had no claim in interpleader against the Guys, and the Guys indisputably had no claim against the policy limit. The interpleader subject matter cannot be said to be logically related to the Guys' bad faith claim–a claim that arises from a lengthy course of conduct requiring proof and raises legal issues that bear no relation to the narrow question of to whom should Mendakota pay its policy limit. The factual matrix of the bad faith claim is separate, distinct, far greater in scope and magnitude, and implicates legal issues that have no bearing on the narrow subject matter of Mendakota's interpleader action. There is no "logical relation" between the Rule 22 claim confined to a sum of money and the lengthy course of conduct giving rise to the Guys' bad faith claim; hence that claim is not compulsory.

Defense counsel retained by Mendakota filed an answer on behalf of the Guys on September 9, 2008. The Guys' claims in this action are based on Mendakota's unreasonable failure to settle the Savages' claims against them, by accepting the Savages' limits offer, or otherwise, that resulted in the excess judgment entered in February 2010. A claim for failure to settle does not accrue until entry of an excess judgment. In *Vanderloop v. Progressive Cas. Ins. Co.*, 769 F.Supp. 1172, 1173-74 (D. Colo. 1991), an insurer claimed that a bad faith action for failure to settle filed three years after judgment entered in the trial court was barred by the two-year statute of limitations for tort claims. The court rejected this argument, holding that:

> When … the economic injury alleged is the actual imposition of an excess liability judgment on the insured, the harm or damages element of the bad faith tort claim necessarily remains *uncertain* and *speculative* until final judgment on appeal either establishes that exposure or dissolves any liability.   The tort is simply not complete until the plaintiff's injury is established.

*Id.* at 1175 (emphasis added).   The Colorado Supreme Court cited *Vanderloop* with approval in *Brodeur v. American Home Assur. Co.*, 169 P.3d 147, 148 (Colo. 2007), confirming that a bad faith claim based on a failure to settle resulting in an excess judgment does not accrue until injury is known by a final judgment that exposes the insured to excess liability.

Mendakota argues that the bad faith claim was "mature" because the Guys were aware of conduct that could support such a claim at the time their answer in the interpleader action was filed because they knew from an August 5, 2008 letter (**Ex.** 18) and the interpleader complaint itself that Mendakota had declined the Savages' offer to settle with them for the liability limit.   *See* **Mtn.**, at 17-18.   This argument completely ignores the requisites for accrual of a bad faith tort claim and assumes knowledge on the part of the Guys and the attorney retained by Mendakota to represent them. Moreover, in that same letter Mendakota advised the insureds that its intent and desire was to obtain a full release of them in exchange for the policy limit.   **Ex.** 18.

A claim for bad faith breach of an insurance contract matures into a viable cause of action when *both* the injury and its cause are known or should have been known by the exercise of reasonable diligence.   *See Brodeur v. American Home Assur. Co.*, 169 P.3d 139, 147 (Colo. 2007) (emphasis added).   This standard recognizes that recovery of damages for the tort of bad faith breach of an insurance contract is based upon

traditional tort principles of compensation for *injuries actually suffered.* *Nunn v. Mid-Century Ins. Co.*, 215 P.3d 1196, 1199 (Colo. App. 2008) (emphasis added). Actual damages are an essential element of a claim for bad faith that the insured must prove. *Id.* Additionally, the tort of bad faith encompasses an entire course of conduct, here including conduct occurring before, during, and after trial. *Dale v. Guaranty Nat. Ins. Co.*, 948 P.2d 545, 552 (Colo. 1997); *Geiger v. American Standard Ins. Co.*, 192 P.3d 480, 485 (Colo. App. 2008) (because this type of claim encompasses an insurer's entire course of conduct, separate claims cannot be maintained).

Instances of misconduct did occur before September 9, 2008, including the filing of the interpleader itself, but the fact remains that injury to the Guys was not established and made certain until the judgment entered against them. That injury, no matter how predicable it may have been, was contingent until February 17, 2010, more than 18 months after the interpleader answer was filed. *See Brodeur*, 169 P.3d at 147. Perhaps even more importantly, at the time Mr. Tienken file the interpleader answer, the Savages had not filed a legal claim against Plaintiffs – they did not move to file their cross claim until January 28, 2009 (**Ex. 20**), after first withdrawing the settlement offer.

### III.   CONCLUSION

For the reasons stated herein, Plaintiffs request denial of Defendant's Motion.

**DATED** this 3rd day of December 2010.

Respectfully submitted:
*s/ Thomas L. Roberts*
Thomas L. Roberts
tlr@robertslevin.com

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 3rd day of December 2010, I electronically served the foregoing **PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT** to the following e-mail addresses via the CM/ECF filing system:

Jon F. Sands
William B. Stanton
jsands@sweetbaumlevinsands.com
wstanton@sweetbaumlevinsands.com
Sweetbaum, Levin & Sands, P.C.
1125 Seventeenth Street, Suite 2100
Denver, CO 80202

*Counsel for Defendant Mendakota Insurance Company*

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participants in the manner (X mail, hand-delivery, etc.) indicated by the non-participant's name:

N/A

*s/ Nicole Peterson*
Nicole Peterson